UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CESAR RIVERA,

              Plaintiff,

-vs-                                           Case No. 6:04-cv-430-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

              Defendant.
_____/

## MEMORANDUM OF DECISION

      Plaintiff Cesar Rivera ["Rivera"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability, disability insurance benefits, and supplemental security income. *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **REVERSED AND REMANDED** for the calculation and payment of benefits.

I.      **PROCEDURAL HISTORY**

      On August 27, 1999, Rivera filed a claim for disability insurance benefits and supplemental security income benefits, claiming disability as of July 18, 1998.  R.73, 269.  On August 17, 2000, the Honorable Ruben O. Figueroa, Administrative Law Judge ["ALJ"], held a hearing on Rivera's claim.  R. 16.  Attorney Jose Carrion represented Rivera at the hearing.  R. 16.

On September 21, 2000,[1] the ALJ issued an unfavorable decision, finding that Rivera's right testicle hydrocele and depression, though severe impairments, did not render him unable to return to his past relevant work as a carpet cleaner.  R. 20, Findings 3, 8.  The ALJ found that Rivera's testimony was not credible because his impairment could not reasonably be expected to produce the pain he alleged.  R. 18.  The ALJ also declined to give controlling weight to the opinions of Rivera's two treating physicians on the grounds that they conflicted with the medical record as a whole and opined on topics reserved to the Commissioner.  R.  19.  On January 24, 2001, the Honorable Ivar E. Avots, Acting Adminstrative Appeals Judge, issued the Appeals Council's first decision denied Rivera's request for review.  R. 3.

Rivera appealed to the United States District Court on February 1, 2001, initiating case number 6:01-cv-132-Orl-18KRS [the "2001 case"].  On August 24, 2001, the Commissioner filed a motion to remand.  Docket No. 15 in the 2001 case.  The Commissioner noted in the motion that Rivera's attorney did not object to the motion "provided the case is heard by a different Administrative Law Judge this time."  Docket No. 15 in the 2001 case at 1.  The Honorable G. Kendall Sharp granted the motion on August 29, 2001, entering an order remanding the case for the ALJ to "give specific reasons for rejecting treating sources' opinions" and to "recontact treating sources for further clarification of opinions if necessary."  Docket No. 16 in the 2001 case at 1.  Judge Sharp's order did not address Rivera's desire to have his case heard by a different Administrative Law Judge.

---

[1]In a related case, the Commissioner found Rivera disabled and entitled to both DIB and SSI benefits since **September 22, 2000** — the day following the ALJ's unfavorable decision.  R. 298.  Although the ALJ considered the Commissioner's favorable finding of disability dated June 22, 2001 in this case, R. 298, the Commissioner has chosen to withhold that favorable decision from the certified record in this case.

The Appeals Council remanded the case, and forwarded the file to the Honorable James R. Ciaravino, Chief ALJ, in Orlando.  R. 315.  The Appeals Council further ordered that, upon receipt of the case file, "the case will be assigned to an Administrative Law Judge pursuant to the order of the Appeals Council."  R. 315.  On February 13, 2002, the Honorable Ruben O. Figueroa — the same ALJ who had initially handled Rivera's claim — held another hearing on Rivera's claim.  R. 332.  Attorney Jose Carrion represented Rivera at the hearing.  Rivera again testified with the aid of a Spanish interpreter, R. 334, but no Vocational Expert ["VE"] testified.

On February 22, 2002, the ALJ issued a second unfavorable decision.  Despite Rivera's physical and mental impairments, the ALJ found that Rivera remained capable of performing the full range of unskilled light work from July 18, 1998 until September 21, 2000, the day before the Commissioner's favorable determination that Rivera was disabled.  R. 304, Finding 12; R. 298. The ALJ found that Rivera's allegations regarding his limitations were "not totally credible" because they were contradictory, inconsistent with his conservative treatment regiment, and not supported by objective medical findings of disorders that could reasonably be expected to give rise to the impairments alleged.  R. 303.  The ALJ therefore found that Rivera had *no credible non-exertional limitations*.  R. 302 - 03.  Based on Rivera's age, education, and work experience, the ALJ applied the Grids without calling a VE, and the grids directed a finding that Rivera was not disabled during the applicable period.  R. 304, Finding 13.

On February 27, 2002, Rivera sought review of the second unfavorable decision from the Appeals Council.  R. 285.  Two years later on February 25, 2004, the Honorable Linda B. Kalet, Administrative Appeals Judge, advised Rivera that the Appeals Council had considered his

arguments on appeal, but had "concluded that there is no basis under the regulations for the

Appeals Council to assume jurisdiction." R. 283.  Judge Kalet gave the following explanation for

that conclusion — 1.) the ALJ's evaluation of Rivera's subjective complaints and credibility is

adequate, and the ALJ considered all of the physical and mental impairments alleged by Rivera;

2.) the ALJ adequately explained why he did not give the treating source opinions controlling

weight;  3.) the limitations found by the ALJ allow the use of the grids without the need for VE

evidence.  R. 283.

On March 29, 2004, Rivera timely appealed the Appeals Council's February 25, 2004

decision to the United States District Court on the ground that the ALJ and Appeals Council erred.

Docket No. 1.  On October 28, 2004, Rivera filed a memorandum of law in support of his appeal.

Docket No. 15.  On December 22, 2004, the Commissioner filed a memorandum in support of her

decision that Rivera was not disabled.  Docket No. 16.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Rivera assigns six errors to the Commissioner.  First, Rivera argues that the Commissioner

erred by failing to give proper weight to the testimony of two of his treating physicians.  Second,

Rivera argues that the Commissioner failed to properly evaluate his subjective complaints of pain.

Third, Rivera argues that his pain and depression precluded the Commissioner from reliance on

the grids.  Fourth, Rivera argues the Commissioner erred by failing to recontact his treating

sources for further clarification of their opinions, as ordered by Judge Sharp.  Fifth, Rivera

contends that the Commissioner's failure to reassign this case to a different ALJ as agreed by the

parties requires remand.  Sixth, Rivera argues that the ALJ should have consulted a vocational expert to determine whether his pain prevented him from performing the full range of light work.

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that the ALJ properly discounted the two treating physicians' opinions as unsupported, inconsistent with the overall record, and opining on subjects reserved to the Commissioner.  Docket No. 16 at 6 - 9.  Second, the Commissioner argues that the objective medical evidence did not support Rivera's testimony, which was therefore properly discounted.  Docket No. 16 at 5 - 6.  Third, the Commissioner argues that, given the ALJ's findings that Rivera suffered no significant non-exertional impairments, reliance on the Grids was proper.  Docket No. 16 at 9 - 10.

Fourth, the Commissioner argues that Judge Sharp's order required the ALJ to recontact the treating sources only "if necessary," and that the ALJ did make two efforts to contact one of Rivera's treating sources, but that physician never responded.  Docket No. 16 at 11.  Fifth, the Commissioner contends that Rivera's request for another ALJ was not made a part of Judge Sharp's order.  Finally, the Commissioner argues that the record contained no evidence suggesting that Rivera's pain or depression might limit his ability to perform the full range of light work, rendering a vocational expert unnecessary.[2]

---

[2]In an effort to assist the parties in providing information to the Court in a useful manner, this Court expressly warned that it is "not sufficient to adopt the facts in the ALJ's decision."  Docket No. 14.  Nevertheless, the Commissioner "adopts the facts as stated in the ALJ's decision (Tr. 298 - 303) and the [sic] as set forth in the Argument below."  Docket No. 16 at 1.

III.    **THE STANDARD OF REVIEW**

    A.    **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

    B.    **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405 (g)(Sentence Four).  The district court will reverse

a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d

688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for

failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3]  *Id.*

## IV.   <u>THE LAW</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

**A.      DEVELOPING THE RECORD**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

**B.      THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545 (b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In

-12-

determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event,

the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); Lewis *v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a

-14-

claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is

-15-

impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E. PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

-16-

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

-17-

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the

-18-

criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked

during the period of time pertinent to the determination of disability.  Information concerning the

individual's behavior during any attempt to work and the circumstances surrounding termination

of the work effort are particularly useful in determining the individual's ability or inability to

function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

     Particular problems are often involved in evaluating mental impairments in individuals

who have long histories of repeated hospitalizations or prolonged outpatient care with supportive

therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic

disorders commonly have their lives structured in such a way as to minimize stress and reduce

their signs and symptoms.  Such individuals may be much more impaired for work than their signs

and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single

examination may not adequately describe these individuals' sustained ability to function.  It is,

therefore, vital to review all pertinent information relative to the individual's condition, especially

at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to

obtain adequate descriptive information from all sources which have treated the individual either

currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

     Attention must be given to the effect of medication on the individual's signs, symptoms

and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment

may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

V.      **APPLICATION AND ANALYSIS**

A.      **The Facts**

On July 30, 1998, Rivera sought treatment at the emergency room at Lucerne Medical Center.  He reported pain in his testicle when he tried to lift chairs at work.  The physician noted swelling of the testicle.  The diagnosis was epididymitis[4] of the right testicle.  R. 181 - 87.  Rivera sought treatment at Florida Hospital Centra Care between July 31, 1998 and August 29, 1998.  He complained of pain and swelling of the right testicle that had persisted for 15 days.  Ultrasound examination revealed bilateral hydroceles.[5]  R. 192 - 202.

On August 25, 1998, Rivera sought treatment from Thai M. Pham, M.D. for nervousness and insomnia.  R. 213.  Dr. Pham prescribed Xanax.  R. 213. On September 28, 1998, Rivera

---

[4]Inflammation of the elongated structure that connects the testis and the vas deferens.  STEDMAN'S MEDICAL DICTIONARY (26th ed. 1995) (hereinafter "STEDMAN'S") at 583.

[5]A collections of serous fluid in the tunica vaginalis testis or in a separate pocket along the spermatic cord. STEDMAN'S at 815.

returned, complaining of nervousness and insomnia.  R. 210.  Dr. Pham again prescribed Xanax. R. 210.  On October 26, 1998, Rivera was seen by Charles H. Moorefield, M.D., P.A. due to continuing complaints of pain in his right testicle.  Dr. Moorefield noted tenderness to palpitation of the right epididymis, which reproduced Rivera's complaints of pain.  He assessed Rivera as suffering chronic epididymitis and referred him to a urologist.  Dr. Moorefield also planned to keep Rivera on "modified duty with no lifting greater than 15 lbs."  R. 190 - 91.

On December 3, 1998, Rivera requested a refill of his Xanax prescription from Dr. Pham, saying that he was feeling anxious and depressed.  R. 208.  He complained of agitation, fatigue, nervousness, insomnia and depression. R. 208.  Dr. Pham prescribed Zoloft.  R. 208.  On December 31, 1998, Rivera returned to Dr. Pham, complaining of anxiety and difficulty sleeping. R. 207.  Rivera returned to Dr. Moorefield for follow-up treatment on January 21, 1999.  R. 188 - 89.  He reported continuing right testicular pain, including occasional pain radiating to the right side of his back and down the anterior thigh.  Dr. Moorefield noted that an exam performed by a urologist had been entirely normal.  The assessment was chronic, recurrent right testicular pain. Dr. Moorefield recommended having Rivera reevaluated by another urologist.  R. 188 - 89.

Rivera returned to Dr. Pham on February 2, 1999 for another refill of Xanax, saying that he was suffering insomnia but that he was feeling better.  R. 206.  On March 3, 1999, Rivera returned to Dr. Pham, seeking refills of Xanax and Prozac.  R. 205.  He complained of insomnia and depression, but said that he was feeling better.  R. 205.  On April 2, 1999, Rivera again saw Dr. Pham, complaining of agitation, fatigue, nervousness and insomnia.  Dr. Pham prescribed Xanax and Prozac.

On May 25, 1999, Rivera began treatment with Jorge L. Cambo, M.D.  R. 224.  He complained of a bulk inside his right testicle and continued pain since an accident at work on July 16, 1998.  R. 242.  He also complained of depression.  R. 242.  On June 8, 1999, he again sought treatment from Dr. Cambo for a two-day fever and complaints of right testicle pain.  R. 240.  On July 20, 1999, he returned with continuing complaints of pain and swelling in his right testicle.  R. 236.  Dr. Cambo filled out a "Certificate to Return to Work/School" for Rivera, stating that his patient was "currently disabled and unable to return to work."  R. 237.  Although Dr. Cambo had been treating Rivera, he did not include any further explanation of Rivera's condition in the form.  R. 237.

On August 9, 1999, Rivera began treatment with Jose M. Suarez, M.D., a psychiatrist.  R. 264.  On his first visit, he underwent a psychiatric examination.  Rivera said he had been doing well until July 16, 1998, working housekeeping for Orlando International Airport, when he lifted a chair to clean a carpet and immediately felt a pain in the groin on the right side.  He was sent to the emergency room of ORMC, where he was told he had epididymitis.  He stated the doctor did not prescribe any pain medication.  He said he had a lot of pain in his right testicle, and saw various doctors and had several tests.  He was told to go back to work but the pain was so intense, and radiated into his legs, that he did not go back to work.  R. 264.

Rivera became progressively very depressed, began having crying spells, and was not able to sleep.  Dr. Suarez described Rivera's affect as sad, and noted that Rivera admitted suicidal ideation with a plan to cut his wrists.  Rivera's eye contact was poor, and he did poorly in the addition, subtraction and multiplication of serial seven.  His remote memory was preserved but his

serial memory was poor.  He recalled one object of three after five minutes.  His judgment and

insight were limited.  Dr. Suarez diagnosed Rivera as suffering 1.) Major Depressive Disorder,

Recurrent Type, Generalized Anxiety;[6]  2.) Pain Disorder Associated with Psychological Factors

and General Medical Condition; 3.) a history of epididymitis; 4.)  pain in the right testicle; and 5.)

bilateral hydroceles.  Dr. Suarez diagnosed on Axis IV (Psychosocial and Environmental

Problems) an inability to do his regular job without pain.  R. 265.  Rivera's GAF was 50.[7]  Dr.

Suarez opined that Rivera's prognosis was "guarded."  R. 264 - 65.

    Rivera again sought treatment from Dr. Cambo on August 17, 1999.  R. 233.  He

complained of continuing pain in his testicular area, said he was taking pain medications with half

relief, and said he felt pain when ambulating or when standing for long periods of time.  R. 233.

On October 12 , 1999, Dr. Cambo noted that Rivera was still complaining of pain in his testicle.

R. 228.  He assessed Rivera as having a right hydrocele with chronic pain, depression, and GERD.

R. 228.

    At the request of DDS, Dr. Nitin Hate, M.D. performed a consultative examination on

Rivera on October 25, 1999.  R. 142 - 44.  Dr. Hate noted that Rivera did not speak much English.

---

[6]Dr. Suarez expressly makes his diagnosis pursuant to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].  The diagnostic criteria for DSM-IV 296.3 Major Depressive Disorder, Recurrent, are the presence of two or more major depressive episodes including: depressed mood most of the day, nearly every day; markedly diminished interest or pleasure in all, or almost all activities most of the day, nearly every day; significant weight loss; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day;  feelings of worthlessness or excessive or inappropriate guilt nearly every day; diminished ability to think or concentrate, or indecisiveness, nearly every day; recurrent suicidal ideation.

[7]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates **serious symptoms**, or **serious impairment** in social or occupational functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

R. 142.  Rivera described a history of epididymitis diagnosed one year earlier and complaints

regarding his upper legs.  Dr. Hate's impression was of epididymitis which needed urology

attention and anxiety neurosis.  R. 144.  Dr. Hate wrote that Rivera had a tendency to hurt himself,

and had some superficial scars on his abdomen, which he admitted were self-inflicted injuries.  R.

144.  Dr. Hate urged the friend who had accompanied Rivera to the exam to take him to a

psychiatrist.  R. 144.  He also wrote that pain appeared to be Rivera's main problem, but his

anxiety and neurosis needed to be handled first.

On the same day, October 25, 1999, Rivera saw a consultative examiner, Carlos R. Porges,

Psy.D., ABPP.  Dr. Porges is a clinical neuropsychologist who is a Diplomate in Rehabilitation

Psychology and in the American Board of Professional Psychology.  R. 146.  Dr. Porges did not

have any medical records to review.  R. 146.  Dr. Porges described Rivera as cooperative but

anxious, saying that his mood was dysthymic and anxious, and affect was restricted.   Rivera

complained of sadness, anxiety, jumpy sleep, and restlessness.  Rivera could repeat four digits

forward and three digits backward.  He could not count from 20 to one, could only recall two of

five words after a ten-minute delay, and could recognize two of three words with multiple choice

options.  Dr. Porges described Rivera's thought processes as logical and coherent, with no

evidence of psychotic symptomatology.  Dr. Porges described Rivera's presentation as consistent

with depression and anxiety, and said the precipitator was his medical problem, a testicular hernia.

Dr. Porges opined that Rivera's presentation was consistent with a syndrome involving

somatization of emotional distress, resulting in various complaints — frequently of pain,

gastrointestinal disturbance, and/or tremors — for which no medical explanation is found or which

-26-

are out of proportion to medical findings.  Dr. Porges's diagnosis was "Major Depressive Episode, Recurrent, Moderate."[8]  R. 145 - 46.

On November 24, 1999, Dr. Cambo wrote a "To Whom it May Concern Letter" stating that Rivera had been under his care since May 1999 and that, due to his medical condition, he was unable to work.  R. 224.  Dr. Cambo added that he had ordered further diagnostic tests, and he hoped that, after receiving the test results, he would be able to name a date when Rivera could return to work or predict his prognosis.  R. 224.

Rivera returned to see Dr. Suarez on January 4, 2000.  R. 263.  He sated that he continued to have pain in his right testicle, was still very depressed and could not sleep, had no energy, was very irritable and yelled at his wife.  R. 263.  His wife said he could not get to sleep before 3 a.m.  R. 263.  On January 18, 2000, he told Dr. Suarez he still felt depressed, hopeless and very irritable.  R. 262.  He said he still had bad thoughts, and was afraid he was going to cut his abdomen again.  R. 262.  On February 17, 2000 he said he had lost control the day before and yelled at his wife, which made him feel guilty.  R. 260.  He told Dr. Suarez that his right testicle still hurt, that he was very irritable, that he was sleeping fairly well due to medication but had no appetite and was losing weight.  R. 260.  On March 1, 2000, he told Dr. Suarez he was very upset because he had heard knocking on his door but no one was there, and that he also hears things like someone calling his name.  R. 259.  He reported continuing pain in his right testicle.  R. 259.  He said he was very

---

[8]A "moderate" Major Depressive Episode is one that has a severity between "mild" and "severe."  DSM-IV at 376 - 77.  A "mild" Major Depressive Episode has "few, if any symptoms in excess of those required to make the diagnosis and symptoms result in only minor impairment in occupational functioning or in usual social activities or relationships with others."  DSM-IV at 377.  A "severe" Major Depressive Episode is one that has "several symptoms in excess of those required to make the diagnosis, and symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others."  DSM-IV at 378.

irritable and yelled at his wife.  R. 259.  On March 17, 2000, in addition to his normal complaints of testicle pain and anxiety, Rivera reported having had a depressive spell the previous day, including suicidal ideation and an idea to buy a gun and blow his brains out.  R. 258.  He reported continuing to hear knocking on his door when no one was there, plus problems sleeping.  R. 258.

On April 5, 2000, Dr. Suarez wrote a "To Whom It May Concern" letter stating that, because of his mental condition and physical pain, Rivera was totally disabled and would not be able to work for an indefinite period.  R. 256.  On April 10, 2000, Dr. Suarez signed a statement prepared by Rivera's attorney, which read as follows in pertinent part:

> Dear Dr. Suarez:
>
> Thank you for speaking with me on April 5, 2000, to discuss Cesar Rivera's medical condition.  To summarize our discussion, you have been Mr. Cesar Rivera's treating psychiatrist since August 6, 1999.  You have assessed Mr. Cesar A. Rivera with Chronic Major Depressive Disorder, Pain Disorder Associated with Psychological Factors and General Medical Condition, History of Epididymitis, Pain in Right Testicle, GAF 40-45.  Your professional mental diagnose [sic] status was based on him not able to sleep at night, no energy, very irritable, has no sexual relationships with wife, yells at close relatives, appetite is no good, losing weight, has ideas of purchasing a gun and blowing off [sic] his brains, feels very remorseful.  You have determined that Mr. Cesar A. Rivera's Chronic Major Depression has been with him since his onset date of accident, is causally related to his work injury, not presently at MMI and that he is unable to work at all with this chronic condition and the side effects of his medications.
>
> Doctor Suarez, if you agree with these statements, please sign below and return the original of this letter to me in the envelope provided.  It was a real pleasure speaking with you.

R. 255.  As noted, Dr. Suarez signed the letter.  R. 255.

On April 6, 2000, another physician in Dr. Cambo's medical group wrote on a prescription form that Rivera was unable to work until further notice.  R. 220.  On June 15, 2000, Rivera

-28-

returned for followup to Dr. Cambo, who noted that Rivera's chief complaint was right testicle pain.  R. 219.  Dr. Cambo diagnosed Rivera as having right hydrocele, prostate, and noted that if he failed to improve, Rivera would need surgical repair of the hydrocele.  R. 219.

Rivera returned to see Dr. Suarez on June 27, 2000, telling him that his testicle was swollen and painful, that he could not sleep, was very irritable, and was having nightmares.  R. 252.  On July 25, 2000, Dr. Suarez wrote that Rivera "walked into my office with a pained expression on his face."  R. 248.  Rivera told him that he was very forgetful, was continuing to hear voices, and was very irritable.  R. 248.  He reported yelling at his wife and sleeping poorly.  R. 248.  He complained that his right testicle was very swollen and hurt a lot.  R. 248.  That same day, Dr. Suarez completed a Mental Residual Functional Capacity Evaluation.  R. 249 - 51.  Dr. Suarez assessed Rivera as "Markedly Limited" in all but one domain.  R. 249 - 50.  Dr. Suarez did not provide any remarks or explanations for his assessment.  R. 250 - 51.

On August 16, 2000, Rivera again told Dr. Suarez that his right testicle was hurting a lot, that he could not sleep at night, was very irritated, and yelled at his wife.  R. 268.  He also said that he could not have sexual relations.  R. 268.

### B.     The Analysis

Of Rivera's five arguments in favor of remand, his final two are the most easily resolved. The Honorable G. Kendall Sharp did not explicitly order the Commissioner to recontact Rivera's treating physicians or to reassign the case to a different ALJ.  The ALJ was ordered to recontact the physicians "for further clarification if necessary,"  Docket No. 16 in the 2001 case at 1, but Rivera does not even argue that such clarification was necessary, much less demonstrate that it

was.  The ALJ attempted to recontact the physicians, but they did not respond.  R. 297.  The ALJ's

alleged failure to contact those physicians and the Commissioner's alleged failure to reassign the

case to a different Administrative Law Judge therefore do not constitute grounds for remand.  The

remaining three arguments will be discussed in turn below.

### 1.      Weight of Treating Physician's Opinions

Rivera's contends that the ALJ improperly failed to accord controlling weight to the

opinions of two of his treating physicians — Dr. Campo and Dr. Suarez.  Docket No. 15 at 20.  Dr.

Campo, who treated Rivera from May 1999 through at least November 1999,  stated on two

occasions that Rivera was currently unable to work.  R. 237, 224.  The ALJ offered two bases for

concluding that these  statements were "not ... persuasive."[9]  First, the ALJ noted that Dr. Campo

failed to accompany the statements with specific limitations or a diagnosis, instead indicating that

he intended to order additional tests.  R. 300.  Second, the ALJ noted that a determination of

disability is reserved to the Commissioner.  R. 300.

Rivera does not specifically address the ALJ's proffered reasons for discrediting Dr.

Campo's opinion.  Instead, Rivera quotes the many instances in the record where his physicians

recorded his complaints of testicular pain, both during and after his treatment by Dr. Campo — R.

242, 240, 233, 228, 224, 219, 263, 262, 260, 259, 258, 252, 248, 268  —  and states, without

further explanation, that this evidence provides a solid foundation on which Dr. Campo could base

his opinions.  Docket No. 15 at 15 - 20.  The Commissioner does not address the argument

---

[9]Though not clear from this language, it appears that the ALJ gave no weight whatsoever to Dr. Campo's
opinion.

proffered by Rivera, instead reiterating the points made by the ALJ — that Dr. Campo did not set

out limitations or diagnoses with these statements, and that determinations of disability are

reserved to the Commissioner.  Docket No. 16 at 6.

Dr. Suarez, who saw Rivera from August 1999 to July 2000, R. 264, 248, completed a

Mental Residual Functional Capacity Assessment ["MRFC"] form on July 25, 2000.  R. 249 - 251.

Of the 20 listed categories —  ranging from "ability to remember locations and work-like

procedures" to "ability to interact with the general public" to "ability to set realistic goals or make

plans independently of others" — Dr. Suarez opined that Rivera suffered *marked* limitations in all

but one.[10]  In concluding that the opinions expressed in the MRFC form were not persuasive, the

ALJ first noted that Dr. Suarez's reports of progress notes did not contain objective medical

findings upon mental status examination, but instead "reflect only the claimant's own self-reports

[of] various symptoms."  R. 301.  The ALJ also found that most of those reports were "dated a

significant period of time after the appointments, up to two years later" and that Dr. Suarez's

opinions were inconsistent with the objective medical findings and Rivera's lack of intensive

therapy.  R. 301.  The ALJ did not specify any objective medical findings that were allegedly

inconsistent with Dr. Suarez's opinion.

Again, Rivera does not address the bases identified by the ALJ for refusing to credit Dr.

Suarez's opinion.  Instead he quotes all the medical records (from Dr. Suarez and other physicians)

containing references to him suffering depression, anxiety, suicidal ideation or other neuroses —

---

[10]Dr. Suarez found Rivera suffered only moderate limitations as to his "ability to ask simple questions or request assistance."  R. 250.

-31-

R. 233, 228, 144, 146, 265, 263, 262, 260, 259, 258, 255, 248 — and then states that the quoted

material clearly establishes a solid foundation on which Dr. Suarez could base his opinion.  Docket

No. 15 at 16 - 20.  And again, the Commissioner does not address the points raised by Rivera,

instead simply reiterating the conclusions reached by the ALJ  —  that Dr. Suarez's reports did not

contain his objective medical findings upon mental status examination, but instead reflected

Rivera's self reports of various symptoms and that Dr. Suarez's opinion was inconsistent with the

objective medical evidence and Rivera's lack of intensive therapy.  Docket No. 16 at 8 - 9.  The

Commissioner, like the ALJ, did not specify any objective medical evidence that was allegedly

inconsistent with Dr. Suarez's opinion.

As to both treating physicians, the ALJ failed to demonstrate good cause for entirely

discrediting their opinions.  While it is true that Dr. Campo did not accompany the opinions at

issue with specific limitations or diagnoses, there is no requirement that he summarize the entire

treatment history for his patient in every opinion letter.  Dr. Campo's opinions and clinical

conclusions are supported by evidence of severe impairments even though the opinions are not

*accompanied* by such evidence.

As with any record of psychiatric treatment, the bulk of Dr. Suarez's progress reports

reflect Rivera's own reports of various symptoms.  That alone is not a sufficient basis for

disregarding those reports, or the opinions expressed in the MRFC form.  There is no indication

that Dr. Suarez disbelieved Rivera's complaints, or did not employ his psychiatric training in

reaching conclusions based on what Rivera told him.  Dr. Suarez provided at least two other

-32-

reports containing diagnoses and objective medical findings.  R. 255, 264 - 66.  The evidence

supports the opinions and limitations expressed in the MRFC form.

It appears that the ALJ misread Dr. Suarez's reports.  They were dated within a day of

Rivera's appointments rather than the "significant period of time after the appointments."  R. 301.

For example, the earliest such report in the record is dated January 4, 2000 and shows an

appointment (described as a "Date of Service") of the same day.  R. 263.  The latest report is dated

August 16, 2000 and shows an appointment date of August 15, 2000.  The reports all listed

Rivera's "Accident Date" — July 16, 1998 — which the ALJ may have misread as the

appointment date.

The ALJ also stated that Dr. Suarez's opinions were inconsistent with other objective

medical evidence.  R. 301.  However, the ALJ failed to specify the allegedly conflicting evidence,

and this Court's review of the record has not uncovered any.  Although the ALJ described Dr.

Suarez's opinions as inconsistent with Rivera's lack of intensive therapy, the record shows that

Rivera saw Dr. Suarez once or twice a month from August 1999 to August 2000, and that he was

taking antidepressants and anti-anxiety medications during this period.  R. 218, 248 - 68.

Absent "good cause" to the contrary, the law requires the ALJ to give substantial weight to

the opinions of Dr. Campo and Dr. Suarez, Rivera's treating physicians.  Although the ultimate

determination of disability rests with the Commissioner, the law does not permit the ALJ to

discount the clinical opinions of Dr. Campo and Dr. Suarez regarding Rivera's inability to work

— opinions that were not wholly conclusory, but rather were based on a history of clinical

examination and treatment.  In addition, the law requires the ALJ to state with particularity the

-33-

weight given the different medical opinions and the reasons therefore, and the failure to do so is

reversible error.  The Appeals Council — which this Court relies on to correct error  — failed to

do so.  R. 283.  Rather, the Appeals Council erred in determined that the ALJ had adequately

explained why he did not give the treating source opinions controlling weight.  R. 283

### 2.    Subjective Complaints of Pain

Rivera contends that the ALJ failed to properly analyze his subjective complaints of groin

pain.  Docket No. 15 at 22.  Specifically, he contends that the ALJ failed to make a determination

as to whether he suffered a medical impairment that could reasonably be expected to produce the

alleged pain.  Docket No. 15 at 22.  Immediately after paraphrasing his duty to apply the pain

standard, the ALJ noted the following:

> The medical evidence reflects that the claimant had an onset of scrotal swelling and
> discomfort associated with heavy lifting in July 1998.  Subsequent ultrasounds of
> the testicles revealed only small right-sided hydrocele.  Magnetic resonance
> imagining of the lumbar spine failed to reveal any abnormalities.  The claimant was
> treated with analgesics.  A consultative examination conducted in conjunction with
> the claimant's claim for Social Security benefits in October 1999 did reveal
> epididymitis, but the claimant had a normal gait.

R. 300 (internal citations omitted).  Rivera makes no effort to challenge the evidence cited by the

ALJ in support of his implicit determination that Rivera did not suffer a medical impairment that

could reasonably be expected to produce the pain he alleged.

The ALJ rejected Rivera's testimony both as to his subjective complaints of groin pain, and

also as to his mental impairments.  R. 300.  Rivera contends that the ALJ failed to articulate

adequate reasons for rejecting his subjective complaints of groin pain.  Docket No. 15 at 22.

Surprisingly, Rivera does not expressly argue that the ALJ erred in rejecting his complaints of a

-34-

mental impairment.  Docket No. 15 at 20 - 23.  Nevertheless, Rivera's complaints of groin pain

and mental impairments are inextricably intertwined.  *See, e.g.*, R. 146.

According to the ALJ, Rivera testified that, during the period at issue, his groin pain

limited him to walking for 20 feet, standing for one second, and sitting for two hours.  R. 300.  He

also claimed he could perform no lifting, that he knew "nothing," that he attempted suicide three

times, heard voices and had frequent nightmares.  R. 300.  The ALJ found that such "extreme

limitations" would preclude caring for oneself, were unsupported by the medical record, and were

inconsistent with the "very conservative" treatment rendered to Rivera for his groin pain, which

included no operations, hospitalizations, or emergency room visits.  Therefore, the ALJ found

Rivera's allegations as to his groin pain to lack credibility.  R. 300.  Given this Court's disposition

on the other issues, there is no need to resolve whether the ALJ failed to properly analyze Rivera's

subjective complaints of groin pain.

### 3.    Improper Reliance on the Grids

Rivera contends that the record has established that he suffers from chronic testicular pain

and depression, and that these non-exertional impairments precluded the ALJ's reliance on the

grids.  Docket No. 15 at 24, 26 - 27.   The Commissioner argues that the ALJ properly found that

the record contained no credible evidence that Rivera suffered non-exertional limitations, making

reliance on the grids proper.  Docket No. 16 at 9.  Although such a finding is implicit in the ALJ's

decision to utilize the grids, the ALJ never explicitly made it.  The Appeals Council, however,

expressly concluded that the limitations found by the ALJ allow the use of the grids without the

need for VE evidence.  R. 283.  The Appeals Council is wrong.

The ALJ properly found that Rivera could not return to his prior work as a carpet cleaner, office cleaner and packer.  R. 298, 304, Finding 8.  The burden of proof shifted to the Commissioner to establish that Rivera could perform other work that exists in the national economy.  In determining whether the Commissioner has met this burden, the ALJ was required to develop a full record regarding the vocational opportunities available to Rivera.  Although this burden may sometimes be met through exclusive reliance on the grids, such reliance in this case was improper because Rivera did not suffer primarily from an exertional impairment, without significant non-exertional factors.

Because of Rivera's significant mental disorder, the Commissioner could meet her burden of proof only through the use of a vocational expert.  The ALJ's failure to give appropriate credit to the medical opinion of Rivera's treating psychologist as to the severity of Rivera's mental disorder does not require a different result.  Without the testimony of a vocational expert who has considered the relevant mental limitations, it is far from apparent that a person with Rivera's mental problems can do unlimited types of unskilled light work.  The ALJ erred in finding that Rivera had no credible non-exertional limitations.  The Appeals Council states that the ALJ's findings that Rivera had no mental limitations  —  assuming that finding is correct  —  would have permitted the use of the grids without the need for VE evidence.  R. 283.  Nevertheless, the Appeals Council erred because VE testimony was necessary in this case.  Rivera clearly had non-exertional impairments:  Major Depressive Disorder and pain.

-36-

**VI.     CONCLUSION**

The decision of the Appeals Council is **REVERSED AND REMANDED** pursuant to

Sentence Four of 42 U.S.C. § 405 (g) for the calculation and payment of benefits.  Rivera's

application has been pending for six years  —  since August 21, 1999.  The Commissioner has had

two opportunities to meet her burden of proving that other work exists that Rivera can perform,

but has failed to do so.  Indeed, the Commissioner has already found Rivera disabled as of

September 22, 2000, the day after the period under consideration in this case.  R. 298.  The

cumulative effect of the evidence establishes disability during the relevant period without doubt.

The Clerk shall enter a judgment and close the case.

**DONE AND ORDERED** this 31st day of August, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

-37-

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Ruben O. Figueroa
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817